I'm William Dewey and I represent Ching Khoi Saechao and the briefing in this case pretty much outlines the issues but there are a couple a couple things that I think are important for the court to review that are not necessarily evident from the briefing and are evident from the record. First of all there are in there are two agreements in this case. It's important the court understand the timeline as to how these two agreements occurred. The first agreement was an agreement between Mr. Brown and the defense attorney, myself, where Mr. Saechao agreed to plead to misprison of a felony in exchange for the dismissal of the action. That was a simple charge bargain, not a plea agreement that would have a lot of terms, but a simple charge bargain. Both parties agree that that was approved by the person, the chief of the criminal division, who needed to do that, who needed to approve it. Then a couple days later, this was on June 5th, a couple days later on June 7th, a plea agreement, a written plea agreement was sent to the defense attorney. That had a lot of additional terms. Those additional terms required Mr. Saechao to do many, many things. He had to waive his right to appeal. He had to waive his right to any Rule 35. He had to waive his right to be able to challenge if the court objected to the plea agreement, the plea was not accepted for any reason, he had to agree that the government could come back and charge him with additional charges, any charges that were covered by the factual situation that arose in the original case. And indeed, that did happen after the plea agreement was not upheld by, or specific performance was not upheld by Judge Sedgwick. It turned out that the state, or the government, came in and upped the ante. They added another charge which required Mr. Saechao to now have an explanation in the record as to why he would have possessed opium. So, those additional obligations on the part of Mr. Saechao also came with a promise, and that promise was contained right in the plea agreement. That promise involves that the state, the government, would not withdraw from the plea agreement as long as Mr. Saechao agreed to uphold his side of the bargain. That is, if he did not breach, the government would not withdraw. Now, Mr. Saechao agreed to that. The Council had authority to agree to that. It was, there was communication between Mr. Brown and the Chief of the Criminal Division who indicated that they had approved that. It was then filed with the court with a statement connected to it. Saying that this is an approved plea agreement by both sides, that Mr. Saechao must read it, or have it read to him through an interpreter over the weekend. It was over that weekend, the government decided to withdraw from the agreement. But at that point, Mr. Saechao had already negotiated an agreement to require the government, a security clause, if you will, a security clause that would prevent the government from withdrawing from the agreement. And it's on page 35 of our acts of conservative record. Basically, here's my question, is that typically, I mean, the plea agreements don't really exist outside the ambit of the court. They're not done until all the appropriate procedures are completed and the court approves the agreement. Your argument somehow suggests that there's this enforceable promise separate and apart from the court approval of the agreement. What is your best case for that? The United States Supreme Court upheld a promise by the defendant at a pre-trial negotiation period that had nothing to do with the court that he would waive any right to statements made during plea negotiations to come in. That is, the court has enforced an agreement against the defendant. But this is the question in this case, can we enforce agreements against the government? But you basically want to unbundle the plea agreement and start taking different parts of it and making them enforceable separate and apart from the court. That would be the result, correct? No, because the plea agreement would still have to be accepted by the court. Well, but the security agreements are in most of the plea agreements and they're in there for obvious reasons because of things that occur after the plea agreement is approved by the court. But what you would have us do is there could be a whole variety of paragraphs in the plea agreement that would basically be enforceable separate and apart from the court. And that seems to me to really undermine the whole concept of court approval and administration of plea agreements. So maybe convince me I'm wrong about that. We are not asking that this court issue an order to the district court, that the court has to accept the plea agreement. I understand. You don't want the prosecutor to be able to withdraw from the plea agreement. We don't want the prosecutor to be able to withdraw from the plea agreement if the defendant doesn't breach. That is, when that language was put in, and it was put in by government. But there's no agreement yet. Well, there is an agreement in a promissory sense. That is, it's a contract. My client negotiated additional terms of an agreement and got something in return. That return was that he couldn't withdraw from the agreement without penalties and they couldn't withdraw from the agreement without penalties. The government, the courts have said, in Monsanto, that those kinds of agreements during plea negotiations are not accessible. And then we have that as part of our plea agreement itself. All we're asking this court to do is to remand so that this plea agreement, which was accepted by both sides, and when the government argues that it's not accepted, that was rejected by both sides. That this plea agreement be presented to the judge and they had an obligation to present it to the judge. Now, in terms of the power of this court to do that, I think the Blaylock case and the Fagan case are pretty instructive. That is, this court has instructed district courts and the government to present plea agreements that were not communicated to a defendant to a court, at least for the court's consideration. Now, if what Judge Sedgwick said in his order was the case and what the government has argued, that they're entitled to withdraw no matter what they put into a plea agreement, no matter what they negotiate with the defendant, that if that was true, then the Fagan case and the Blaylock case on remand, all the government had to do was withdraw the agreement. I see that that's a little bit different. I kind of start seeing separation of powers issues here when the court decides what agreement the United States ultimately must sign up to. You can argue bad faith, dirty dealing, double dealing and all that, but then the question is, can we make the United States, having offered the agreement, basically sign up to it? Well, as I understand it, it actually didn't sign the agreement. Is that correct? Actually, the United States, Mr. Brown signed the agreement and an affidavit was filed by Ms. Loeffler, the chief of the division, that said that she approved both the written agreement and the oral agreement in the beginning. In the beginning. In the oral agreement and the written agreement that was signed by Mr. Brown. Therefore, yes, it was essentially signed. She presented a signing essentially with her affidavit verifying that she had approved the agreement. What I would go back to is that in the commercial, this is a very unusual case because I've never seen a plea agreement where this particular clause, where the only obligation really of my client not to breach, is basically to enter his plea and have that plea hold. Not appeal later on, not claim ineffective assistance to counsel based on facts he knows now. Basically, all he had to do under the agreement was plead. Now, this is normally put into plea agreements in which the government says the defendant has to do a bunch of things. But here, the defendant's obligation only was to plead to the case and make it final. So, when they say, we won't withdraw unless the defendant breaches and then sets up a whole procedure for the court to determine if the defendant has breached, the defendant's only obligation was to plead. Now, the plea agreement's acceptance and the plea are separate in the high case. They are different. But this judge basically said, even if the defendant had pled, this judge's position and the trial court judge's position was the government could withdraw any time up until the acceptance of the plea agreement. One, that's wrong under the law. But two, he also went on and said that Mr. Sachow, as an immigrant from Laos, who doesn't speak the English language, who only speaks Mian, who only speaks a language that has no written component, and is mentally ill, should have known that as the law. Even though it wasn't the law, he should have known that. Therefore, he couldn't have detrimentally relied on the agreement. The second part of the opinion of Judge Sedgwick that's incorrect is about detrimental reliance. When the defendant originally went in to change a plea and said, I want to change my plea, I don't care what they want to do, they don't have the right to withdraw. And these are the reasons. And that transcript's in the, we gave every reason that he couldn't withdraw based on the plea agreement itself, that the government couldn't withdraw. Judge Sedgwick then set a strange briefing schedule. We asked for specific performance. But the government was then given the opportunity to do the first briefing. And if you like, you can compare the supplemental record, excerpt the record where the memorandum of the government is included, along with the order of Judge Sedgwick in the original order. The original order came down the same day, or was written the same day. It was written on the 13th, dated on the 13th, sent out on the 13th. The reply brief of the government was dated the 10th of July. Now, the government got the first bite. They didn't argue detrimental reliance, even though they were unnoticed of it from the hearing. They didn't argue a failure of detrimental reliance. So when the opposition brief, which was styled as a motion to withdraw from the plea agreement, when the opposition brief by the defendant came in, we didn't really address detrimental reliance because there wasn't really an issue. We had raised the issue. The government had not responded in their first brief to that issue. So we didn't respond. The reply brief comes in, talks about detrimental reliance for about two paragraphs on the last page. And then Judge Sedgwick finds that in the absence of evidentiary support, detrimental reliance cannot be found. We then file a motion for reconsideration saying, wait a minute. We have a lot of detrimental reliance. We state it in the first hearing. And then we gave an outline of the evidence that we would produce in terms of the detrimental reliance, including the defendant having to go basically to the court and asking to be the defendant's lawyer, going to the court with the defendant's psychiatrist to try to have him put into a mental institution preventing him from committing suicide because of the breach of the agreement. Now, we were then denied an evidentiary hearing on the detrimental reliance issue, even though it was never even an issue in the government's briefs. It was raised as an issue, but then the court said we didn't respond. Correct. Now, that in and of itself, this court should at least remand for a detrimental reliance hearing. I don't know who would have the problem with the first production on detrimental reliance. That would seem to be you. We outlined the detrimental reliance in the original hearing at the change of plate. The government did not address it at all, so there appeared to be no dispute about detrimental reliance. Then the opposition came in. We argued detrimental reliance using the same facts that we had noticed to the court in the original hearing. And then the government responded. We then asked for an evidentiary hearing after the judge ruled there was no evidentiary basis. What we're really saying here is this. You're sitting across the table in good faith with the government, and the defendant can waive important rights during that pre-plea negotiation period, and so can the government. Well, you have the difference. You have the language in all these cases that we have the language in the cases that states that the government or the defendant can withdraw from a plea agreement at any time before the court accepts the agreement. Your Honor, actually, United States versus Hyde, the United States Supreme Court has held that a defendant can't. That a defendant has to have a fair and just reason, even after his plea. He's entered the plea. The plea agreement hasn't been accepted, so he can't do that. The government would take the position that they're different than defendants, that they're entitled to do it right up until the plea agreement has been accepted. At least that seems to be what they're briefing us. But in Hyde, that's where the court, I thought, as opposed to we're kind of one step before that. That's correct. Okay. The question is, there's a long line of people. Why would Hyde argue Hyde? The government brought up Hyde in the original, in their original memorandum, which is attached to their supplemental excerpts. It's just a matter of are we going to treat the government differently than a defendant? We don't have any plea in Monsanto. You have pre-negotiation agreements being, the defendant being held to those, because there were promises on both sides and consideration, and it was a bargain for agreement. Therefore, his statements could be used against him that were used under 410 in Rule 11 that would normally not be used against him. So the defendant can do that. Why can't I? Is it your position that the district, the only reason, well, that the district judge would have accepted the plea agreement had not the government asked to withdraw? Yes. And what do you base that on? I base that on the fact, the weakness of the evidence in this case. The judge had approved two plea agreements with the co-defendants for misdemeanors. My client, who was accused of signing his own name to the delivery of boxes to a house in which he didn't live and was suffering from a mental illness at the same time, that that was the evidence, and the question was whether he knew that the other people were involved in criminal activity, so that his prisoner of felony was certainly a logical position. Also, the government signed off that it was a logical position. I don't want to shortcut your plea agreement argument, but as you might infer, I'm somewhat skeptical, but I'm going to go back and read all those cases again. But I am concerned about the jury trial waiver, given his language as well as his apparent emotional difficulty. Now, it doesn't rise to the level of insanity that we've seen in some of the other cases, but I'd appreciate it if you could address that, because that does give me pause. Well, the jury trial issue, it was a decision by a defendant which I think is more complicated than a plea. That is, when you're pleading guilty to a crime, you know you did it or you're going to say you did it, and you plead to the crime and you know you're not going to get a trial. So when all the rights are gone through, you're right to a jury trial, you know you're not getting a trial. When you're changing your mind about whether you want a jury versus a judge, it's a more complicated decision for a defendant to make, because the defendant doesn't have any experience in the court. This particular defendant did not speak English. This particular defendant did not. I think the question that we're asking is whether your client's waiver of a jury trial complied with the federal rules. And was the waiver in writing, the government consents, the court accepts, was the waiver made voluntarily, knowingly, and intelligently? That's what we're asking. It comes down to the question of whether the colloquy was sufficient. We're probably somewhere between a plea agreement and when you have to waive counsel, for example, where you have this very extensive colloquy. But this is a pretty skimpy colloquy. But what would the district court need to do? The district court, I think in Christensen, it outlines and the cases that follow that. I think it outlines what a court needs to do. It needs to inquire about the mental illness, I think, if there's mental illness involved. In the one case, I think the Carrera case, if I could just get my notes. That, in that case, it was Duarte. In that case, the court had actually had psychiatrists examine the defendant on two occasions. This particular judge had before him, in dealing with the depositions of health care providers in Thailand, had actually reviewed, or they had been filed with him, the mental health reports that are attached in our exceptional record. So the judge had those things available. He probably should have gone through those. The Christensen case. Probably or should have? No, he should have. He should have gone through them. In the Christensen case, he should have made a more extended colloquy. You know, you've been thrown a lifeline and you can't seem to swim towards it. This man at the end of the colloquy between Judge Sedgwick and this this particular defendant, Judge Sedgwick asked the defendant to make notes. If he had any questions of his, of his counsel. Judge Sedgwick, at the time of the jury, jury waiver, knew that the defendant was illiterate. Couldn't write, couldn't speak the English language, and had no written language in which to communicate with and meet him. He also had all of those psychological records. He should have gone through the extended. Well, if we determine if the defendant really understood the right to a jury trial, he said that we got from Judge Sedgwick was a colloquy that's at the very beginning, which is quoted by the government. Explain what a jury trial is about. He and how juries are selected. He simply said the trial judge will explain that to you in the trial. Or something to that effect. I want you to just hear from the government. May it please the court. I'm Karen Leffler for the government in this case. And I do want to address the two legal issues in the brief. I think I'll do it in the same order if I may. I'm going to start out with the plea agreement because there's a little bit of a disagreement about the interpretation of this in the record in the case. And I want to talk a little bit about the defense claim that there were two agreements. On the supplemental excerpt of record at page 15 was the policy letter that the government sends out in every single case. And went out in this case. And it starts out with the fact that there are no oral agreements. In other words, you can have plea negotiations. It says, A, all offers to the government to enter into a plea agreement and all plea agreements must be in writing. AUSAs have no authority to make an oral offer or enter into an oral plea agreement. And that's the policy letter that went out in this case. And it went on to explain the procedure, which is, of course, you can have negotiations and the criminal chief can approve the offer, which I did. I was the criminal chief at the time. Thinking that it would go through. And then a plea agreement, a formal written one. And this wasn't a unique one. This is the foreign plea agreement with the foreign terms in it. The defense attorney and the defendant sign the agreement. Then it comes back to the U.S. Attorney's Office with the government signatures blank. The assigned AUSA signs it. And it goes to the U.S. Attorney for signature. That's the process. And what happened here is when it came back to the U.S. Attorney's Office, the AUSA signed it. Went to the U.S. Attorney and he said no. He said, I want to find out some more things. He said no. And as the affidavit points out, defense counsel was then notified that the government was not going to go through with the agreement. Defense counsel, doing his job, said, I think you should go through with it. And we said, okay, we'll hold off. The U.S. Attorney said, we'll hold off our thoughts. You know, there was about two more days of there. And then the U.S. Attorney said no. So at the time we walked into the courtroom, the U.S. Attorney's Office didn't even bring the agreement to the courtroom. They filed a notice that morning saying we're not going to go through with the plea agreement. Defense counsel said, I want specific reform. He said, please bring the plea agreement in and file it with the court, which we did. But the court had already been notified that the government wasn't going through. And you start out with the Savage case, which simply says plea agreements are, you know, until they're accepted by the court, unless there's been detrimental reliance, they're not valid. Rule 11 matters. The contract analogy doesn't work. I want to address for a second the claim. Do we know why the U.S. Attorney turned down his plea agreement? I do. He apparently accepted the plea agreements of the others. Yes. I think I was the acting U.S. Attorney and he was out of town on the other two. I think that's why in the supplemental excerpt that the defendant filed, the supplemental, supplemental, there's another plea agreement and I signed it as the acting U.S. Attorney. He was out of town. But we don't have anything in the record on that topic. I think when it came back, the affidavit that I filed in response to one of these said that the U.S. is all you have. And the U.S. Attorney said there were two concerns. One involved 67 pounds of opium. Why would we do this? And the second one had to do with the fact that the defendant crossed out the name we had on the plea agreement and changed it. And I think that's all the affidavit says about it. So I know the answer to the question, but I'm not comfortable. It's not in the record, the things that went on in the office about it. So what we had is, I mean, at the original hearing, the defense counsel stood and said, Judge, I want specific performance and he wants to go free with it. And the government counsel, there's not much from government counsel, but there is at some point saying, Judge, I don't think that's the law. You know, the law is until we go through the Rule 11, both sides can withdraw. And then the court asked for briefing on it and ultimately decided that that was the law. And the issue that Judge Sedgwick made a comment about the policy letter, and he wasn't saying the policy letter is irrelevant. What his comment was, and the answer was that it's a legal point that's absolutely true. If the AUSA had signed the document, sort of snuck around the policies, gone into the courtroom, gone through the Rule 11 procedure, and, you know, in essence represented the government and said, we've done it, and the guy had changed his plea,  say the U.S. attorney has to sign it, would not change that. And that's absolutely, of course, right. But that's not what happened here. You know, a policy, everybody knew the U.S. attorney has to sign it, and he said no. And then we informed everybody that's going to happen. And there was no, the allegation of detrimental reliance was that he was emotionally upset by not going through with the deal. And what we've done is cited a number of cases pointing out the type of detrimental reliance that courts are calling on is the situation where, I mean, a good example is you do a cooperation agreement with a guy, he doesn't yet change, he cooperates, he's debriefed, you know, maybe he's in front of the grand jury, and then the government says no. And the court, you know, could very well say, wait a minute, he's performed the agreement first, and you can't back out at that point. But that's not what happened here. He was put back in exactly the same situation that he was before. And detrimental reliance was addressed in the government's reply brief. It's at the supplemental excerpt of Record 66. There's a, you know, little heading that says detrimental reliance. I'd be happy to answer any more questions on this issue. Otherwise, I'd like to turn to the waiver argument. Okay. Very well. If I can turn to the waiver argument, I want to talk, before addressing Christensen and Duarte directly, there's an issue before that because we're not in the same position as we were with Christensen and Duarte. The Supreme Court in Vaughn says when you make no objection to a colloquy, you know, then we're in a plain error situation. And as the Supreme Court said in Vaughn. Is that a Rule 11 case? It was a Rule 11 case. We have a little part of Rule 11 that talks about that, don't we? We don't have that in Rule 23. No, we don't. We have harmless error. Rule 11 has an 11-H that refers to harmless error. Of course. But, I mean, this is a subset of Rule 11. If you're saying to give up your right to a trial altogether require, you know, if you don't raise the issue during the colloquy as plain error, it doesn't make sense to say in sort of a sub-colloquy where you're not giving up your right to trial, you're just saying I want a jury trial, that we're in a different standard. Well, none of it makes sense anyway. Excuse me? Judge, you haven't told me about this right and that right and that right. I object. Right. I mean, the point I was getting is the – and I mean to be answering your question. I'm not sure I understand your question, Judge Canby. Well, I'm just making the point that to say that an unintelligent, unknowing defendant has to object to the point that the judge is failing to tell him things the judge is required to tell him in order for him to raise that on appeal is a nonsensical point. I'm not saying it's not fair in Vaughan. That's not what you're – in the court of Vaughan, actually, what they did is they put some oomph on the defense counsel. In the actual language of Vaughan, they talk about defense counsel sort of standing silent when the court could correct it right there. I mean, if somebody stood up and said, Judge, you need to ask some more questions. Well, the U.S. attorneys do that all the time. Of course they do. They stand silent while the judge, you know, steps into error. I hope not. I mean, we try not to. We have an obligation to try not to. That happens. Let me step back, though. I mean, it seems to me, Rule 11, you know, there's a lot of truly technicalities you have to jump through when the district judge is, you know, with respect to plea agreements. And, you know, sometimes they don't have their list out and they miss one, and it could be easily corrected. It does seem that the waiver of a jury trial, which is a significant constitutional right, is something where, like waiver of counsel, but maybe not quite the same, but it does have a waiver of counsel aspect to it where it's significant to how your trial is going to be conducted. You have a colloquy here of, like, three lines. Well, I mean, there's more than that to the issue, and I want to go back. I mean, in Rule 11, you have not only waiver of trial, but in Vaughan itself it was informing you of your right to counsel. I mean, so it was a very important right that, I mean, what the court, of course, ultimately found was that, I mean. . . Maybe you could argue it under both criminal and constitutional law. Right. But, I mean, and so I mean, I mean, using the plain error here, it is the defendant's burden. If Vaughan applies, it's the defendant's burden. And under Menore, again, these are all Rule 11 cases, but Menore. . . I know that. So if it's plain error, that's one way we would look at it. And if it's de novo, we would look at it slightly differently. And let me go to some facts that are very different than Christensen and Duarte here. Because you have to look at not just the colloquy, because there was an arraignment beforehand, which is cited in the brief, in which Magistrate Judge Branson, in essence, gave the discussion of a jury trial that I believe it's Christensen's. . . Christensen was referring to Cochran and said, here, you need to describe what a jury is. And Judge Branson did that. And how long before the waiver of the jury trial was the arraignment? It was a number. . . I believe the arraignment was June and the jury trial ended up ultimately being September. Right. So we're not talking. . . Some law students couldn't remember from June to September what all the elements of a jury trial are. I don't know how this gentleman, who came from this particular background, was necessarily. . . So you would like us to impute the arraignment to his knowledge. Well, I think that. . . I'm back to Vaughan, which is that was the second hole in the Vaughan. I've got to look at the whole record. So I'm relying on a legal analysis to do that. And there was a discussion of the whole jury trial, but there are other things here. You know, because, of course, Rule 23 says, you know, it must be in writing. It actually doesn't require a colloquy, although, of course, the gloss on it rightfully says, you know, that's not good enough. But in this case, we had some other things that haven't been brought up. The defendant in this case was always addressed through an interpreter. There's no dispute about that. There had been many, many proceedings before this. There was never a suggestion that the defendant did not understand the proceedings through an interpreter, ever, in any of the proceedings. There was a whole fairly lengthy colloquy about what the jury would be. Again, that was June. When we got to the actual colloquy in September, the court didn't just turn to a me-in person. There was an interpreter there. There was no suggestion by the interpreter or anybody that he had any trouble understanding this interpreter. And the document itself, he signed the written waiver, not beforehand, when the court wouldn't, you know, have known whether he'd been interpreted. He signed the written document in the courtroom, and it was read to him in yin. And then he signed it. Now, there's another certification that went on here that has not been addressed, and, you know, that certainly didn't happen in Duarte or Christensen. And that is defense counsel signed a document. It's on my brief page 26. I quoted it. The form itself was, you know, after it was read to the defendant and he signed it, the defense attorney signed the document saying, the undersigned attorney and counselor at law represents that prior to the signing of the foregoing waiver, he was fully advised as to the rights of the accused under the Constitution and laws, et cetera. And I, you know, the part I bolded in it, and this is the defense attorney certifying to the judge in the hearing that the waiver was voluntarily and understandingly made and recommends to the court that the waiver be approved. That certainly didn't exist in any other case, and it's a situation, and obviously the district court judge has a right to rely on defense counsel certifying in writing that this has been described and that he understands it. But let's go on, again, looking at the record. There was a strategic use made of this waiver, and that was when you got to the sentencing. I mean, there's nothing in the record to suggest that he didn't understand it and didn't want to do it, and then when they got to the sentencing, it was tried in front of Judge Sedgwick, and Judge Sedgwick found Mr. Satchel guilty, and then the argument was made at sentencing, you should accept responsibility because he waived his jury trial rights, save for the court time. So, I mean, you have a much broader record than the situations in Christensen and Duarte. With regard to the mental issues. But whose responsibility is it under Rule 23? To make sure that the waiver is knowingly involuntary? Yeah, the judge's. It's certainly the judge's. It's certainly the judge's. I mean, you've got someone from a different culture who has this man's background and who has some mental illness and all the rest of it. I would think that the judge would take a little time and explain it point by point, what this person was giving up in waiving a jury trial. And, you know, a lot of times people from other countries, they just stand there and go to an interpreter and they just say, yes, yes. And you're not quite sure whether they're getting it or not. Well, Your Honor, I think there's, again, here, you have to look at the whole, I mean, I can't speak for exactly what was in Judge Sedgwick's mind or either counsel. I was not trial counsel in the case. But I can look at the record here. And, again, this judge, I believe I noted in the briefing, this judge had had the defendant in front of him. The district court had six times, I believe. I mean, this was not, there was a long history of this. There had never been at any time a suggestion that the defendant, I think unlike in Christensen, that anybody was looking for an insanity plea or wanted to have him psychologically analyzed for the court or anything like that. It's certainly the judge's obligation to make sure that the person understands it. But in this case, as the record showed, there had been a specific actually Christensen meeting discussion of the jury beforehand. And it wasn't right before. And there had also been, you know, counsel that had very ardently represented this person throughout, certifying to the court also that the defendant did it. I do need to clarify. I've made a mistake in the government's brief, and I want to make sure you all know it. In the brief, on page 23, I said that counsel traveled to Thailand with the defendant for the depositions. And trial counsel informed me I think that is wrong. I think he did not. Thank you. I want to make sure I cut that out. I don't think that's the case. The mental issues here are a little different. Remember, I also want to point out finally to a couple of findings of Judge Sedgwick with regard to the mental issues. Because we have in this case on the record a judge addressing that in a number of contexts. It was a defense to the crime that was put on, and the judge said, I think your actions were logical, focused, and clear. With regard to the claim that he was too depressed to have been involved, and the judge relied on the fact that Mr. Seh Chow, when he gets the opium that's not opium, they do this whole surveillance where they drive all over the city of Anchorage all day, trying to make sure there's no surveillance, calls Thailand and says, Hey, it's not opium. It's not my fault. I didn't do it. Anyway, the judge found in that situation, I think this was clear, logical, focused action. Then at the sentencing, there's a request for a downward departure based on diminished capacity. And the court says, You're depressed. I'm not doubting it. But I don't find any significant mental problem. I find that you don't suffer from a significant mental defect. And then we have about an 18-month record. We have a request for psychiatry. You know, am I wrong? Isn't that one of the obligations of the district judge? If the defendant's mental capacity is somehow, you know, called into question, that the court should appoint an examiner, a psychiatrist to examine the defendant to see whether the defendant is incompetent to stand trial. I think it's not only the judges. Of course, the prosecutors and obviously defense counsels, all three of us have a role. I think independent requirements to do that if it happens. But the fact is, in this case, the record, I think, simply indicates that, yes, I mean, there are many people that suffer from depression. And, you know, whether that but that nobody thought it affected his ability to understand the proceedings. Defense counsel, who certainly has ardently represented this person from the very beginning, never suggested that competency was an issue. The judge or the magistrate judge, both of which saw him repeatedly over the years that this case went on, nor the various prosecutors, there were two or three on the case, ever saw a competency issue. And the judge's rulings on other mental issues went the other way. So, of course, the judge has an obligation. But there was no indication here that it was necessary. The question I would have is, I think it does distinguish itself from Christian and the others where you have truly a more of an insanity situation. But following on the heels of this withdrawal of the plea agreement and the evidence put forward about alleged emotional state, wouldn't it figure into whether his waiver was knowing and voluntary, or even if he were depressed, for example, you wouldn't have to be insane to have the impact of whether or not you have a knowing and voluntary waiver, would you? No, of course not. If there was an indication that you couldn't, you didn't understand what was going on and you weren't doing it knowingly and voluntarily. I mean, he could understand, even if he understood what was going on, but in his situation, if he were depressed or had some mental... probably should have explored, I don't know for sure, but it seems to me it would make sense for the district judge to explore that and then to tell us, you know, having had my discussion with you, you know, make a finding, for example, that whatever mental issues you might have don't have an impact on your ability to understand the proceedings or to give a voluntary waiver or da-da-da-da-da. Then we would, of course, say, okay, we give deference. I will say, I mean, again, obviously if the judge had done it, we wouldn't be here on this issue, but I'd also want to say, in a little defense of Judge Sedgwick, is that he had very lengthy proceedings where nobody had suggested that... I mean, the issue of mental depression had come up way before this. I mean, there were bail hearings. There were saying we need to go to Thailand to take depositions, and part of the reason to go is because we want to say that this is why he went to Thailand was because he suffered from things and he was getting health treatments and not, you know, to purchase drugs. So there were, I mean, in deference a little bit to Judge Sedgwick here, there were long sets of proceedings where nobody had suggested, we had mean interpreters for every proceeding that the defendant had any trouble understanding what was going on. And in this proceeding on the one issue where the judge said, the form, and for some reasons I have no idea, the District of Alaska form has also a waiver of special findings, and defense counsel said, wait a minute, judge, you know, I haven't instructed him on that and I'm not sure he understands that, and we just crossed it right off. So I think what the judge did is he relied on defense counsel, you know, who, as I said, strongly represented him, and when there was an issue that came up that said I don't think he understands it, they took it off, and counsel certified in writing he understands what's going on. And so I think that, you know, you'd always, I mean, we can always come back, but ultimately I think Vaughn controls this and we're not in the flat-out circumstances, and even then there are distinguishing facts between the cases of Christensen and Duarte where a presumption of regularity did not apply, and this case where it should. Thank you. Thank you. All right, go ahead. I have one question, Mr. Duvin. That is the apparent inconsistency in the defense position that, no, it was an unknowing voluntary waiver, and then saying to the judge, by the way, this ought to be taken into account, this is one of the reasons in his sentencing that he's entitled to a break. We argued that the offense itself, no, this is a time, it's time-related. That is, I'm talking about the time period of the actual offense itself. No, you argued the fact that he, you know, waived his right to jury trial. I thought that was one of the issues. Well, I thought you were asking about it. I misunderstood the question. September was when he waived his right to a jury trial. After September, we litigated an issue of suppression, which had a significant amount of information in regard to mental illness as well. The judge found that the statement given by Mr. Sehjial was suppressed because it was involuntary, partially due to his mental illness. Then when we went to trial in April, there was no colloquy whatsoever about a jury trial. There was simply an order issued that it was a judge-striped trial. We went forward with a judge-striped trial. There was no other mention of any waivers of jury trial. So the judge had additional information as well. The judge's finding at sentencing was not that he didn't suffer from a significant mental illness, but he was not motivated in the offense by a significant mental illness. That is, he actually found he said at sentencing... I'm not sure I follow your chronology. Do you want to start from the beginning? To get the departure based on mental illness, you don't just simply show your client suffered from a mental illness, but the decision he made, the judgments he made in relation to the facts of the case, that is, being involved in some sort of an opium deal, were significantly influenced by his mental illness, not to the extent of being a defense, but were significantly influenced by his mental illness in getting involved. That is, you get a departure, you don't get an acquittal. The judge found that the motivation behind Mr. Satchel's actions at sentencing did not have to do with his mental illness. However, he did find, quote, that there is no doubt that the defendant had a significant mental and emotional problem. That's at 232 of the excerpts of the record. That's at the sentence. So the quotation... Did you sign that waiver, that jury trial waiver? Yes, and the question... That's what we're talking about. The question... I signed the waiver. I mean, I'm glad you're not griddly, because you'd have missed all the shots. I signed the waiver, but that was eight months before the trial. I think that if I understand your question, it had to do with the apparent inconsistency with a statement that he understands that... that it was an unintelligent waiver. And your position at sentencing, that he's entitled to a reduction for accepting responsibility, because after all, he did waive his jury trial. When you're arguing acceptance of responsibility... I'm trying to find your exact statement, but keep talking. The only way you can get acceptance of responsibility when you've gone to a jury trial, I mean, gone to trial, is under the one case that was cited in the brief. And a little note at the end of the acceptance of responsibility issues in the sentencing guide. We talk about a defendant who waived jury trial. So Mr. Sachow, at sentencing, had waived a jury trial. So yes, we used that fact to try to get a better sentence. No, but the problem is, he's waived a jury trial, but you say, no, but it was not a real waiver, so now you're telling us that he should get it both ways. He should have gotten his credit at sentencing, but now, of course, you're asking us to overturn the trial. And the real question is, you having signed the waiver statement, and then on his behalf making that argument, whether basically there's just no further argument to be made on his behalf. He's, in effect, milked it for all it's worth at this point. Maybe I could start with the signing of the waiver in September of the jury trial. When I signed that, there was no colloquy by the judge. Could I just stop there? It's a small thing, but I think you're adding a letter in that word. It's colloquy.  Thank you. When the judge informs the defendant, or asks the defendant questions to determine if he understands his mental capabilities, that's not only for the education of the judge, it's also for the education of the defense lawyer. That is, there are examples of times you go in and you do a plea, and as the judge asks questions, it becomes clear that your client doesn't understand what he's doing. That didn't happen to him. How long had you represented him at the time of the waiver of jury trial? I represented him from November until September. And you never said at the time of the entry of the waiver of jury trial, you know, Judge, there could be an issue here, particularly since we just argued that to you on the withdrawal of the plea agreement, there could be an issue here given his language and his potential depression. That was never mentioned by the defense. It was never mentioned by the defense, and that was probably a mistake on my part. As time goes on, the defense counsel does get educated, and educated as to more aspects of his client's mental capacity. But in terms of mental capacity, this man spoke only me. There isn't a psychologist in the United States that speaks me. There isn't a psychiatrist that speaks me. It's very difficult to determine mental capacity based on Dr. Pai's reports, which are the ones you have attached, as well as communicating with a person that only speaks another language and comes from a culture which the judge was educated on, that he believed that his mental illness was caused by spirits, and that's why he needed treatment in Thailand, and that he believed in ghosts and he heard voices. So the judge was aware of that prior to the September, as was I, as was the defense attorney. But at the same time, the judge didn't question the defendant to the point where maybe that would have come out. Maybe if we had done a Christensen or Dorte inquiry of the defendant, it would have come out, and the defense lawyer as well as the judge might not have been fooled. The other thing I wanted to... I think that the briefing on the issue of Rule 23, the trial was eight months afterwards. There was significant litigation. But if we go back to the plea agreement, I just want to make one point. Savage, Washburn, all of the cases in this case... We're beyond that. All right. We're beyond. You just have a minute. You've already used it up. You've talked about the plea agreement until you're exhausted, aren't you? I quit. I quit, Your Honor. All right. Okay. The matter will stand submitted.
judges: Pregerson, Canby, McKeown